UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jason Berner, | Civil Case No. 21-cv-01639 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Metropolitan Council, Metro Transit Division, a Minnesota public corporation and political subdivision, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## INTRODUCTION

Plaintiff, Mr. Jason Berner ("Plaintiff" or "Mr. Berner"), seeks relief from the discriminatory employment practices of his former employer, Defendant Metropolitan Council, Metro Transit Division ("Defendant" or "Metro Transit").

As set forth below, Mr. Berner worked for Metro Transit as a bus operator and instructor since 2004. Over the course of a few weeks in the summer of 2017, Mr. Berner experienced gradual numbness in the right side of his body, and after evaluation by neurologists at the Mayo Clinic in Rochester, Minnesota, Mr. Berner was diagnosed with an intracerebral hemorrhage caused by malformed blood vessels in his brain. Following a few months of approved medical leave for evaluation and treatment, in January 2018 Mr. Berner received medical clearance to return to work from both his treating Mayo Clinic neurologist as well as a Federal Motor Carrier Safety Administration ("FMCSA")

1

Medical Examiner. With that clearance, Metro Transit allowed Mr. Berner to return to work as a bus operator, and he then worked for several years without any issue whatsoever.

This case arose in February 2020 when Metro Transit suddenly and without legitimate justification terminated Mr. Berner from his long-held career as a bus operator based on unfounded fears about the intracerebral hemorrhage that Mr. Berner had experienced several years prior, notwithstanding that Mr. Berner's treating neurologist and FMCSA Medical Examiners at the Mayo Clinic had consistently certified Mr. Berner as fit for duty since January 2018 and Mr. Berner had not experienced any recurring symptoms of any kind.

## NATURE OF THE ACTION

1. This is an action for judgment against Defendant for damages and other relief resulting from disability discrimination in employment in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADAAA"), and the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* ("MHRA").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367 because this civil action arises under the laws of the United States and the Court has supplemental jurisdiction over all Minnesota state law claims because they are so related to the federal claims in this action that they form part of the same case or controversy.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Metro

Transit conducts its operations in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PROCEDURAL PREREQUISTIES

4. Plaintiff has satisfied all procedural requirements prior to commencing this action. Prior to the filing of this Complaint, Plaintiff timely filed a written charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). That disability discrimination charge was also filed with the Minnesota Department of Human Rights. The EEOC issued a Notice of Right to Sue letter on June 7, 2021 and fewer than ninety days have elapsed.

## THE PARTIES

5. Plaintiff Jason Berner is a natural person residing at 3103 98th Avenue North, Brooklyn Park, Minnesota.

6. Defendant Metro Transit is part of the Transportation Division of the Metropolitan Council, a public corporation and political subdivision of the State of Minnesota. Metro Transit provides light rail and bus transportation services throughout the Minneapolis-St. Paul metropolitan area.

## FACTUAL BACKGROUND

**A.   Metro Transit's Physical Qualification Standards for Bus Operators.**

7. The Federal Motor Carrier Safety Administration ("FMCSA") is a federal agency within the U.S. Department of Transportation ("DOT"). Amongst other things, the FMCSA regulates the operation of commercial motor vehicles in interstate commerce.

8. To accomplish this mission, in part, the FMCSA has promulgated physical qualification standards for drivers of commercial motor vehicles. *See* 49 C.F.R. § 391.41.

9. In order to operate a commercial motor vehicle in interstate transit, individuals must obtain clearance from a healthcare professional certified by the FMCSA (*i.e.*, a "Medical Examiner") to conduct physical examinations. These examinations are colloquially called "DOT exams."

10. If a Medical Examiner determines that an individual satisfies the FMCSA physical qualification standards, the Medical Examiner provides the individual with a Medical Examiner's Certificate, which is colloquially called a "DOT card."

11. The FMCSA physical qualification standards do not apply to transit operations performed by a political subdivision of a state. 49 C.F.R. § 390.3(f)(2). Accordingly, Metro Transit and its bus operators are exempt from the FMCSA physical qualification standards.

12. Notwithstanding this exemption, Defendant Metro Transit requires all bus and light rail operators to submit to periodic physical examinations by Medical Examiners who are employed by a third-party medical clinic, Minnesota Occupational Health ("MOH"), for certification that the operators meet the FMCSA physical qualification standards.

13. For many years, Metropolitan Council and MOH have been signatory to a contract by which MOH provides medical services to meet the business and regulatory needs of the Metropolitan Council. As part of that contract, Medical Examiners employed by MOH have provided physical examinations to Metro Transit bus and light rail

operators. MOH is compensated for those physical examinations through its contract with the Metropolitan Council.

14. Metro Transit requires all bus and light rail operators to hold a DOT card as a condition of employment certifying that they meet the physical qualification standards set forth in the FMCSA regulations notwithstanding that Metro Transit and its employees are exempt from those FMCSA regulations.

15. Within the past several years, Defendant has informed its bus and light rail operators that it will only recognize DOT cards issued by Medical Examiners who are employed by its contracted medical vendor, MOH.

16. However, despite informing its bus and light rail operators that they must obtain a DOT card from MOH as a condition of employment, within at least the past several years Defendant has also accepted DOT cards from Medical Examiners employed by other healthcare providers, such as the Mayo Clinic in Rochester, Minnesota.

B.   **Mr. Berner's Employment History.**

17. Plaintiff started working for Metro Transit in 2004 as a part-time bus operator, and he held that position for approximately six months. He then left that part-time position for about 18 months to go to college, but then returned to work as a Metro Transit bus operator in April 2006.

18. Plaintiff became a full-time Metro Transit bus operator in August 2006.

19. Plaintiff was diagnosed with Stage 4 non-Hodgkins lymphoma in or about December 2006. Plaintiff then took an approved medical leave of absence from work while he underwent treatment.

20. After achieving remission in October 2007, Plaintiff was cleared by Metro Transit's medical vendor to return to full-time bus driving.

21. Plaintiff had a 5-year remission follow-up medical appointment in 2012, where an MRI revealed Plaintiff had a cavernous malformation (a cluster of abnormally formed blood vessels) in his brainstem. At that time, the cavernoma did not cause any symptoms.

22. Several years later, in or about July of 2017, Plaintiff began to experience numbness on the pad of his right thumb. Over a period of a couple of weeks, the numbness gradually spread to the fingertips of his right hand, then his right arm, and lastly to the right-side of his body.

23. These symptoms eventually prompted Plaintiff to see his primary care physician at the Park Nicollet Clinic, who then referred him to specialists at Methodist Hospital. When those doctors were unable to determine the cause of the numbness, they referred Mr. Berner to the neurology department at the Mayo Clinic in Rochester, Minnesota.

24. Between August 21 and 25, 2017, Plaintiff underwent a comprehensive medical evaluation by a team of doctors at the Mayo Clinic in Rochester, Minnesota. Eventually, those doctors determined that Mr. Berner's symptoms were caused by a hemorrhage of the cavernoma in his brainstem. At that time, the doctors recommended that Mr. Berner abstain from his bus driving work until he could obtain further evaluation and diagnosis. Notably, at no time did Mr. Berner's Mayo Clinic neurologist state that Mr. Berner's condition presented any elevated risk of sudden incapacitation or seizure.

25. Mr. Berner then reported to a fitness-for-duty evaluation on September 12, 2017 with Dr. John Kipp, a DOT Medical Examiner employed by Metro Transit's contracted medical vendor, MOH. Several weeks later, on October 23, 2017, Dr. Kipp—who is not a neurologist—recommended to Metro Transit that Mr. Berner be permanently restricted from bus operation work based on his erroneous and unfounded belief that Mr. Berner's medical condition presented a significant and perpetual risk of sudden incapacitation.

26. On November 16, 2017, Plaintiff returned to the Mayo Clinic for an evaluation with neurologist Dr. Kelly D. Flemming, a subject-matter expert on brain cavernomas. At no time did Dr. Flemming state that Mr. Berner was at risk of sudden incapacitation. In fact, Dr. Flemming specifically noted that "patients with cavernous malformation usually have a slow leak and symptoms often gradually occur over days to weeks. Patients often experience similar symptoms to what they had in the past."

27. On January 2, 2018, Plaintiff met with Dr. Lawrence Steinkraus, a FMCSA certified Medical Examiner at the Mayo Clinic, for a DOT exam. As part of that exam, Dr. Lawrence consulted with Mr. Berner's neurologists about the prognosis of his cavernoma and noted that "[h]is neurologic exam at this time is completely unremarkable." Dr. Steinkraus further determined that Mr. Berner met the FMCSA medical standards for operation of a commercial motor vehicle.

28. Dr. Steinkraus thus issued Mr. Berner a DOT card but recommended that Mr. Berner should return to work gradually by only operating a bus for up to two hours per day for the first 3-months, followed by a follow-up DOT exam.

7

29. Metro Transit accepted the DOT card that Mr. Berner received from Dr. Steinkraus in January 2018, and Metro Transit allowed Mr. Berner to return to work as a bus operator with the restrictions recommended by Dr. Steinkraus.

30. During that initial 3-month return-to-work period in early 2018, Mr. Berner worked a full-time schedule consisting of two hours of bus operation work per work day, followed by bus operator instruction work for the remainder of the work day. Mr. Berner performed these duties without incident and had no recurring symptoms whatsoever.

31. Plaintiff returned to the Mayo Clinic on March 26, 2018 for a follow-up DOT exam with Dr. Steinkraus as planned. Following that examination, Dr. Steinkraus once again determined that Mr. Berner met the FMCSA physical qualification standards, and he issued a 6-month DOT card to Plaintiff without any restrictions. Specifically, Dr. Steinkraus found that "Mr. Berner remains stable. He has had no neurologic events. His neurologic examination is completely unremarkable."

32. Defendant accepted the 6-month DOT card that Mr. Berner received from Dr. Steinkraus in March 2018, and Metro Transit allowed Mr. Berner to return to full-time bus operation without any restrictions, including substantial overtime work. Plaintiff performed these duties without incident and had no recurring symptoms whatsoever.

33. On October 8, 2018, Plaintiff returned to the Mayo Clinic for an appointment with his treating neurologist, Dr. Flemming. Dr. Flemming noted that "[s]ince I last saw patient in 2017, he has had no further signs or symptoms suggestive of bleeding. He has had no headaches. He has had no other medical issues."

34. Dr. Flemming also reiterated to Mr. Berner that due to the location of the

prior hemorrhage in the brainstem, it did not present any elevated risk of seizure. Dr. Flemming also informed Mr. Berner that if he had any recurring symptoms, they would likely recur only gradually and be similar to the gradual onset numbness that he experienced over several weeks in the summer of 2017.

35. On October 9, 2018, Plaintiff met with Dr. Laura Breeher, another Medical Examiner at the Mayo Clinic, for another DOT exam. In her assessment, Dr. Breeher noted that "[r]eview of neurology notes indicates that there is not risk of seizure due to the location in the brainstem. Imaging reviewed today did not show any additional lesions or acute issues. He remains asymptomatic. … As the Neurologist indicates symptoms would be gradual onset rather than sudden in the event of recurrence and because Mr. Berner meets the criteria outlined in the FMCSA Medical Expert Panel Guidance, I have endorsed a 1 year medical certificate."

36. Following that October 9, 2018 examination, Dr. Breeher issued a 1-year DOT card to Plaintiff without any restrictions.

37. Defendant accepted the 1-year DOT card from Dr. Breeher and allowed Plaintiff to continue operating a bus on a full-time basis for the entire 1-year term. And once again, Plaintiff performed his bus operation duties without incident and had no recurring symptoms.

**C.   Metro Transit's Decision to Disqualify Mr. Berner From All "Safety-Sensitive" Work, Including Bus Operation.**

38. In October 2019 Metro Transit directed Mr. Berner to attend a medical examination at MOH.

39. On October 7, 2019, Mr. Berner went to Defendant's medical vendor, MOH, for a DOT exam with Dr. John Kipp. Following that exam, on October 10, 2019, Dr. Kipp permanently restricted Plaintiff from bus driving and safety-sensitive work based on his erroneous belief that Mr. Berner had a medical condition that could cause sudden incapacitation. Dr. Kipp's conclusion was directly contrary to the findings and conclusions of Mr. Berner's treating neurologists at the Mayo Clinic, who had specifically concluded that Mr. Berner was *not* at risk of sudden incapacitation given the location of Mr. Berner's prior hemorrhage in the brainstem.

40. A few days later, Mr. Berner returned to the Mayo Clinic on October 17, 2019 for a follow-up neurological examination and MRI. Then a few weeks later in November 2019, Plaintiff met with another Mayo Clinic neurologist, Dr. George Petty. Following his examination, Dr. Petty noted that Mr. Berner "has made an excellent recovery and has not had any symptoms suggestive of stroke or TIA since he was seen here last year in our division. […] His neurological examination is entirely normal and there are no new hemorrhages on the MRI scan."

41. On November 14, 2019, Plaintiff met with Dr. Steinkraus at the Mayo Clinic for a DOT exam. Relying on the FMCSA medical guidelines and Mr. Berner's neurological history, Dr. Steinkraus issued Plaintiff a 1-year DOT card. Specifically, Dr. Steinkraus noted that "it is understood that given the location of the cavernomas ***any recurrence would not be incapacitating*** but would result in some subtle changes… There is in my opinion and given guidance from FMCSA expert panels no reason why we cannot continue with a 1-year issuance at this point. Any changes that would occur would

be recognized fairly quickly by Mr. Berner who is well-educated on this, ***and the risk for seizures is at normal population at this point***." (emphasis added)

42.     As before, Defendant accepted the DOT card from Dr. Steinkraus in November 2019 and allowed Plaintiff to return to full-time bus operation.

43.     And then suddenly, several weeks later on or about January 17, 2020, Metro Transit restricted Mr. Berner from all bus driving and instruction work and ordered him to submit to a fitness-for-duty examination at MOH notwithstanding that Mr. Berner had a valid DOT card, which Metro Transit had already accepted.

44.     Mr. Berner complied with his employer's unlawful directive, and on January 31, 2020, Plaintiff submitted to an examination with Dr. Peter Swann at MOH.

45.     Dr. Swann is an occupational health specialist at the MOH clinic in Shakopee, Minnesota. Dr. Swann is not a neurologist and has no formal training in neurology.

46.     About two weeks after his examination of Mr. Berner, on February 13, 2020, Dr. Swann recommended that Metro Transit permanently restrict Mr. Berner from not only bus operation work, but all "safety-sensitive" job duties within Metro Transit. Dr. Swann's recommendation was based on his erroneous conclusion that Mr. Berner's cavernoma presented an ongoing risk of sudden incapacitation and/or other neurological symptoms that presented a direct threat to himself and/or others. Dr. Swann's conclusions were directly contrary to the medical conclusions and recommendations reached by Mr. Berner's treating neurologists and FMCSA Medical Examiners at the Mayo Clinic.

47.     In addition to the physical qualification standards codified at 49 C.F.R. §

391.41, the FMCSA also publishes medical guidelines and advisory criteria to assist Medical Examiners in the evaluation of individuals with specific medical conditions not directly addressed in the formal standards. Those guidelines are based on expert review and, amongst other conditions, specifically address certification of individuals who, like Mr. Berner, experience an intracerebral hemorrhage in the brainstem.

48. Pursuant to those FMCSA medical guidelines, an individual who experiences an intracerebral hemorrhage in the brainstem may be certified under the FMCSA physical qualification standards provided that the individual: (1) completes a one year waiting period, (2) has a normal physical and neurological examination, (3) has no ongoing symptoms, and (4) receives clearance from a neurologist who understands the functions and demands of commercial driving.

49. It cannot reasonably be disputed that Mr. Berner satisfied all of these criteria as of February 2020 when Dr. Swann erroneously recommended that Metro Transit permanently disqualify Mr. Berner from all "safety-sensitive" work, including bus operation.

50. Dr. Swann purposefully refused to consider the FMCSA guidelines on intracerebral hemorrhage because he believed, erroneously, that Mr. Berner's 2017 intracerebral hemorrhage was not an intracerebral hemorrhage.

51. Instead of considering the FMCSA guidelines on certification of individuals with a history of intracerebral hemorrhage, Dr. Swann engaged in an arbitrary and ad hoc neurological assessment for which he was not qualified, and then reached conclusions that were directly contrary to the known medical evidence.

52. In particular, Dr. Swann's conclusion that Mr. Berner's risk of recurrent hemorrhage, which he calculated to be between 3% and 6%, precluded Mr. Berner from driving a bus "indefinitely" was not based on any objective medical criteria or FMCSA standard.

53. Metro Transit unreasonably and unquestioningly accepted Dr. Swann's recommendation to permanently prohibit Mr. Berner from all "safety-sensitive" work despite Dr. Swann's lack of training in neurology and despite other medical evidence from Mr. Berner's treating neurologists and Medical Examiners at the Mayo Clinic demonstrating that Mr. Berner was physically fit to operate a bus consistent with the FMCSA physical qualification standards.

54. After Defendant disqualified Mr. Berner from bus operation and all other "safety sensitive" work, Defendant instructed Mr. Berner to apply for other positions within Metro Transit.

55. Plaintiff applied for "Helper" positions in the bus maintenance and light rail maintenance departments, but Defendant denied Mr. Berner's applications for those positions on the basis that they were classified as "safety sensitive." Metro Transit never made any attempt to determine whether a reasonable accommodation could be made to allow Mr. Berner to work as a Helper.

56. Plaintiff then applied for a janitorial position, which was not classified as "safety sensitive", but Metro Transit rejected his application because he had no prior experience working as a janitor.

57. Plaintiff also applied for a Stockkeeper position, which was not classified

as "safety sensitive", but Metro Transit lost his application. After Mr. Berner produced proof of his application, Metro Transit rejected him for the position anyway.

58.   Defendant formally terminated Mr. Berner's employment on October 31, 2020.

59.   Plaintiff has suffered "garden variety" emotional distress since Defendant restricted Plaintiff from bus driving and other safety-sensitive work.

60.   Defendant's unlawful actions were intentional.

61.   Defendant's unlawful actions were willful, malicious, and/or in reckless disregard of Plaintiff's federally protected rights.

62.   As a consequence of Defendant's unlawful discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages in the form of past, present, and future wage and benefit losses, garden variety emotional pain, suffering, inconvenience, loss of enjoyment of work, and attorney's fees and costs.

## COUNT I

**DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, AS AMENDED, 42 U.S.C. § 12112**

63.   Plaintiff restates and realleges by reference the allegations in the prior paragraphs of this Complaint.

64.   Defendant's conduct described above constitutes unlawful disability discrimination in violation of Plaintiff's rights under the ADAAA, 42 U.S.C. §§ 12101, *et seq*.

65. Plaintiff is disabled within the meaning of the ADAAA because he has a physical or mental impairment—*i.e.*, cavernous malformation in the brain—that substantially limits one or more of his major life activities when active.

66. Alternatively, Plaintiff is disabled within the meaning of the ADAAA because Defendant regarded Plaintiff as having a physical or mental impairment that substantially limits one or more of his major life activities.

67. Plaintiff is qualified to perform the essential functions of the bus operator position, with or without a reasonable accommodation, because he meets all FMCSA physical qualification standards and has held a valid DOT card from a certified Medical Examiner at all times relevant to this case.

68. Defendant subjected Plaintiff to adverse employment actions when it medically disqualified him from his bus operator position and all other "safety-sensitive" work based on a perceived or actual disability, refused to allow him to work in other open positions, and terminated him from employment.

69. Plaintiff has suffered pecuniary and non-pecuniary damages as a result of this discrimination and is entitled to recover his full damages under the statute.

## COUNT II

**DISABILITY DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, Minn. Stat. § 363A.08**

70. Plaintiff restates and realleges by reference the allegations in the prior paragraphs of this Complaint.

71. Defendant's conduct described above constitutes unlawful disability discrimination in violation of Plaintiff's rights under the MHRA, Minn. Stat. § 363A.01 *et seq*.

72. Plaintiff is disabled within the meaning of the MHRA, having a physical, sensory, or mental impairment—*i.e.*, cavernous malformation in the brain—which materially limits one or more of his major life activities when active.

73. Alternatively, Plaintiff is disabled within the meaning of the MHRA because Defendant regarded Plaintiff as having a physical, sensory, or mental impairment that materially limits one or more of his major life activities.

74. Plaintiff is qualified to perform the essential functions of the bus operator position, with or without a reasonable accommodation, because he meets all FMCSA physical qualification standards and has held a valid DOT card from a certified Medical Examiner at all times relevant to this case.

75. Defendant subjected Plaintiff to an adverse employment action when it medically disqualified him from his bus operator position and all other "safety-sensitive" work based on a perceived or actual disability, refused to allow him to work in other open positions, and then terminated him from employment.

76. Plaintiff has suffered pecuniary and non-pecuniary damages as a result of this discrimination and is entitled to recover his full damages under the statute.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all claims so triable.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff Jason Berner respectfully requests that this Court grant the following relief:

A. Declaring, adjudging, and decreeing that Defendant has engaged in the violations of law set forth herein;

B. Ordering Defendant to immediately reinstate Mr. Berner to his bus operator position;

C. Awarding Plaintiff compensatory damages;

D. Assessing punitive damages against Defendant;

E. Awarding Plaintiff the cost of bringing suit, including but not limited to, expert fees and other expense of this litigation;

F. Awarding Plaintiff reasonable attorney fees;

G. Awarding Plaintiff pre- and post-judgment interest; and

H. Granting all other or further relief as the Court deems just and proper.

Dated: July 16, 2021                             Respectfully submitted,

**s/ Timothy J. Louris**
Timothy J. Louris (#391244)
Nicolas R. Kaylor (#400853)
**MILLER O'BRIEN JENSEN, PA**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2400
Minneapolis, MN 55402
612-333-5831
tlouris@mojlaw.com
nkaylor@mojlaw.com
***ATTORNEYS FOR PLAINTIFF JASON BERNER***